# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **MELANIE ANN DAIGLE** | * | **CIVIL ACTION NO. 10-0313** |
| **VERSUS** | * | **JUDGE DOHERTY** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993. Melanie Ann Daigle, born August 4, 1962, filed applications for a period of disability, disability insurance benefits, and supplemental security income on August 3, 2007, alleging disability as of May 17, 2007, due to cervical spine injuries, carpal tunnel syndrome, shoulder problems, left hip problems, lumbar strain, migraines, and stress.

## FINDINGS AND CONCLUSIONS

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is not substantial evidence in the record to support the Commissioner's finding that the claimant was not disabled and that this case should be remanded for further proceedings.

In fulfillment of Fed. R. Civ. P. 52, I find that this case should be remanded for further proceedings, based on the following:

**(1) Records from Lafayette General Medical Center dated November 7, 2006 to July 28, 2007**.  Claimant complained of neck, back, and left leg pain after being struck by an automobile.  (Tr. 402).  She had a history of fibromyalgia.  (Tr. 402).  X-rays showed no fractures or dislocations.  (Tr. 404-10).  Cervical spine x-rays showed spondylosis.  (Tr. 409).  The impression was back strain and left leg and hip contusions.  (Tr. 403).

On January 19, 2007, claimant reported confusion and abdominal pain.  (Tr. 395-96).  A head CT was normal.  (Tr. 398).  X-rays of the abdomen showed no acute findings.  (Tr. 397).  The assessment was headache.  (Tr. 396).

On June 5, 2007, claimant reported chest pain, shortness of breath, and anxiety.  (Tr. 421).  An ECG showed sinus tachycardia, but was otherwise normal.  (Tr. 415).  The assessment was chest pain and an anxiety attack.  (Tr. 422).

On July 27, 2007, claimant complained of right-sided weakness and facial numbness.  (Tr. 385-92).  An MRI showed small nonspecific hyperintensities in the pons.  (Tr. 392).  A CT scan of the brain was negative.  (Tr. 391).

A carotid duplex report was normal.  (Tr. 383).  A 2-D and M-mode continuous echo color flow Doppler showed 65-70% ejection fraction, 1+

2

tricuspid and mitral insufficiency, and diastolic dysfunction.  (Tr. 382).  The

discharge diagnoses were angioedema, anxiety, depression, headaches, and

chronic pain secondary to motor vehicle accident.  (Tr. 385).

**(2) Records from Dr. Peter Vizzi dated December 19, 2006 to August 9,**

**2007**.  On December 19, 2006, claimant complained of neck, bilateral shoulder,

left hip, and low back pain after being hit by a car one and a half months prior.

(Tr. 262).  She also complained of headaches and trouble sleeping at night.

On examination, claimant had discomfort on range of motion of the neck

and shoulders.  She was grossly neurovascularly intact in the arms and had no

gross instability.   The hip was tender over the left trochanteric bursa.  The lower

extremities were intact, and there was no gross instability of the lower extremity

joints.  She also had tenderness in the low back on motion.

The assessment was fibromyalgia, neck pain, cervical strain, bilateral

shoulder discomfort, left hip trochanteric bursitis, and lumbar strain.  (Tr. 263).

Dr. Vizzi gave claimant a left hip injection.

On January 9, 2007, claimant continued to complain of neck and shoulder

pain and improved hip pain after injection.  (Tr. 613).  On examination, she had

mild impingement and tendinitis.  Her neck had good motion with no instability.

3

An MRI showed some shoulder impingement issues, tendinitis and a degenerative cyst in the right shoulder bone, but no sign of acute abnormality. (Tr. 269, 619-20).  Her neck showed degenerative osteophytes and discs at C4-C5 and C5-C6 with no sign of acute abnormality.  (Tr. 269, 622).  X-rays were negative.  (Tr. 270).

Dr. Vizzi opined that claimant's biggest problem was increase in her fibromyalgia pain due to the automobile accident.  He gave her a right shoulder injection.

On August 9, 2007, claimant complained of continued neck pain and bilateral arm and shoulder pain with right arm numbness and discomfort.  (Tr. 605).  On examination, claimant's motor examination in the upper extremities was 5/5.  (Tr. 607).  Reflexes were symmetric and normal.  She had good pulses and perfusion.  Her left hip exam was relatively benign.

Claimant's MRI scans showed disc issues with nerve impingement.  (Tr. 608).  Dr. Vizzi stated that Dr. Cobb's surgical recommendation was an option with failure of conservative measures.  He noted that without surgery, her maximum medical improvement had likely been reached.  He opined that she would be a limited to desk-to-sedentary job duty, taking frequent breaks every two

hours.  She would not be released to lifting, pushing, or pulling, and would not be required to do any type of activity where she had to strain her neck significantly.

**(3) Records from Dr. Norman E. Anseman, Jr. dated January 18, 2007, 2007 to May 29, 2007**.  On January 18, 2007, claimant complained of joint pain, stiffness, weakness, and muscle pain in the neck/scapular area, headaches from medications, and insomnia, depression, nervousness, heat and cold intolerance, and dry skin.  (Tr. 339).  An MRI of her neck showed disc bulges at C4-5 and C5–6, but no disc herniations or impingements.  (Tr. 340).

On examination, claimant had good stability of her neck, glenohumeral joints, low back, and hips.  (Tr. 341).  She had no focal weakness of either arm, 1+ deep tendon reflexes, and moderate spasm in the neck/scapular muscles.  Dr. Anseman's assessment was soft tissue trauma to the neck/scapula area, possible ligamentous tear of the cervical spine, possible ulnar nerve lesion at both elbows, and temporomandibular joint dysfunction.  (Tr. 339).  He recommended physical therapy and injections.  (Tr. 341).

On February 1, 2007, claimant complained of a severe soft tissue injury of her neck.  (Tr. 293).  She had muscle spasm in her neck.  She also complained of severe insomnia, averaging only three hours of sleep at night.  (Tr. 294).

Dr. Anseman prescribed Seroquel for insomnia, Nexium for reflux from medications, and Cymbalta for pain and stress reduction.  He also ordered a series of joint injections, physical therapy, a home program, a back brace, back support, and seating system.  (Tr. 293, 295-99, 307-27).

An MRI taken on February 21, 2007, showed mild degenerative discogenic disease at C4-5 with prominent degenerative discogenic disease at C5-6, laxity or tear of the longitudinal ligament at C4-5 with less than 2 mm of retrolisthesis, left capsular ligament laxity or tear at C4-5, and bilateral alar ligament laxity or tear. (Tr. 275).

Claimant reported on February 22, 2007, that the trigger point injections had really helped her.  (Tr. 335).

On March 21, 2007, claimant complained of suffering from severe psychological turmoil, anger, depression, and stress.  (Tr. 332).  Dr. Anseman thought that this would interfere with her progression on the physical side.  He recommended referral to a counselor.

On May 29, 2007, Dr. Anseman reported that he had referred claimant for pain management, noting that she had maximized her care with him.  (Tr. 376). He noted that she had made only 25 to 50% improvement.

6

**(4) Records from Dr. John Cobb dated April 18, 2007**.  Claimant

complained of severe neck, shoulder, hip pain, and migraine headaches.  (Tr. 300-

01).  She said that physical therapy made her symptoms worse.  (Tr. 300).  She

was working at that time.  She rated her pain as a 10 on a scale of 0 to 10.

On examination, claimant was tender over the levator and trapezius

bilaterally.  (Tr. 302).  Her range of motion was restricted with pain.  DTRs were

2+ and equal.  Motor and sensory function was normal.  She was emotional and

crying in the exam room.

An MRI dated January 5, 2007, showed spondylosis at C4-5 and C5-6,

diffuse central spondylosis at C4-5 with foraminal narrowing, and foraminal

narrowing and flattening of the central canal at C5-6.  A DMX report

demonstrated hypermobility at C4-5.  (Tr. 309).

Dr. Cobb's impression was post-traumatic cervical pain syndrome,

myofascial pain syndrome of the cervical spine, temporomandibular joint

syndrome, C1-2 and C2-3 facet pain, symptomatic cervical spondylosis at C4-5

and C5-6, with narrowing at both levels, irritating the nerves, and instability at C4-

5.  (Tr. 303).  He recommended an anterior cervical discectomy and fusion with

plate at C4-5 and C5-6.

**(5) Records from Dr. John Oubre dated March 19, 2007 to May 10,**

**2007**.  Claimant complained of TMJ and daily headaches.  (Tr. 359).  The

impression was a Class II division I malocclusion with a history of TMJ and

myofascial pain.  (Tr. 364).  Dr. Oubre prescribed a splint.

**(6) Records from Maureen Brennan, Ph.D dated April 4, 2007 to May**

**15, 2007**.  On April 4, 2007, claimant reported great difficulty adjusting to life

changes related to her pain and physical limitations.  (Tr. 367).  Claimant reported

on April 19, 2007, that her pain medications made her "goofy."  On May 15, 2007,

Dr. Brennan reported that they had lost ground, and claimant was depressed and

discouraged.  She left claimant with a "to do" list of things she could begin to do

for herself, taking more initiative and setting some priorities.

**(7) Residual Functional Capacity ("RFC") Assessment, Physical dated**

**November 27, 2007**.  Belinda Davis, medical consultant, found that claimant

could occasionally lift/carry 20 pounds and frequently lift 10 pounds.  (Tr. 635).

She could stand/walk and sit about six hours in an eight-hour workday.  She had

unlimited push/pull ability.  She could frequently climb ramps/stairs, balance,

stoop, kneel, and crouch, and occasionally climb ladders/ropes/scaffolds and

crawl.  (Tr. 636).

8

**(8) Records from Dr. Cobb dated May 14, 2007 to June 18, 2008**.  On

August 13, 2007, Dr. Cobb stated that claimant was unable to work pending

surgical treatment.  (Tr. 648).

On December 12, 2007, claimant stated that her back gave out and she fell.

(Tr. 643).  She had pain in the lower back and left hip down to the calf, insomnia,

and numbness in both hands and arms.  The MRI of the cervical spine

demonstrated degeneration of the disc at C4-5 and C5-6, with narrowing.  An MRI

of the left shoulder showed adaptive changes, a subchondral cyst without

impingement, and no rotator cuff tear.  A lumbar MRI showed early mild

degenerative changes.  (Tr. 775).

The assessment was post-traumatic cervical and lumbar pain syndrome,

degenerative disc of the cervical spine at C4-5 and C5-6, and bilateral carpal

tunnel syndrome.  (Tr. 643).

On January 2, 2008, claimant continued to complain of neck and back pain,

possible sacroiliac joint pain, and numbness in both hands that was worse in the

morning.  (Tr. 645).  On examination, her stance, posture, and gait were normal.

The MRI films dated 12/20/07 demonstrated an enchondroma in the right

trochanteric area, which was a benign finding.  (Tr. 650).

9

Dr. Cobb's assessment was trochanteric enchondroma on the right, bilateral carpal tunnel syndrome, and degenerative disc of the cervical spine at C4-5 and C5-6.  (Tr. 645).

On February 13, 2008, Dr. Cobb reported that claimant's EMG and nerve conduction studies were positive for carpal tunnel syndrome on the right.  (Tr. 770, 774).  She complained that since that test, she had lost her hearing in the right ear.  (Tr. 770).  She continued to complain of neck pain and headaches.

On examination, claimant's stance, posture, and gait were fairly normal. She demonstrated a very flat affect.

Dr. Cobb's assessment was degeneration of the C4-5 and C5-6 levels, and carpal tunnel syndrome on the right, clinically also on the left.  He recommended a carpal tunnel release on the right, and an anterior cervical discectomy and fusion with plate.  He wrote that she was unable to work at that time.

On June 18, 2008, claimant complained of worsening of her neck pain and numbness in both hands.  (Tr. 1015).  She said that the left was worse with driving, but bothered her all the time.  Dr. Cobb's assessment was carpal tunnel syndrome, right greater than left, cervical spondylosis at C4-5 and C5-6, and a combination of disc protrusion and stenosis.  He recommended surgery, and gave her prescriptions for Celexa, Seroquel, Talwin, Flexeril, and Xanax.

10

**(9) Psychological Reports from Sandra C. Friedberg, Ph.D., dated**

**October 1, 2007 to January 14, 2008**.  Claimant was referred for psychological

evaluation by her attorney.  (Tr. 654).  She was depressed, frustrated, anxious,

angry, and irritable.  (Tr. 655).  She had little patience, disturbed sleep and

appetite, difficulty finishing tasks, was withdrawn, and had poor self esteem.

On examination, claimant was tearful, anxious, and unable to concentrate.

She was functioning within the low range of intelligence with a WAIS-III full

scale IQ of 98, verbal IQ of 91, and performance IQ of 106.  (Tr. 656).  Dr.

Friedberg's diagnostic impression was major depressive disorder, single episode,

severe, which appeared to be secondary to chronic pain and changes in life

situation since the injury.  (Tr. 657).  She recommended continued

psychopharmacological intervention and individual psychotherapy.

The record reflects that claimant continued therapy with Dr. Friedberg until

January 14, 2008.  (Tr. 658-65, 826-33).

**(10) Psychological Evaluation by Sandra B. Durdin, Ph.D., dated**

**January 9, 2008**.  Claimant was anxious and tearful at the examination.  (Tr. 677).

She complained of pain, anxiety, and daily headaches.  (Tr. 678).  Her medications

included Nexium, Citalopram HBR, Seroquel, Alprazolam, Pentazocine, Naloxone

Hydrochlor, and Cyclobenzaprine.

11

Claimant drove, took care of herself and her daughter, watched TV, used the computer, slept, and helped her daughter with homework.  She said that her daughter took care of her sometimes.

On examination, claimant was alert and oriented in all spheres.  Her pace was normal, and attention and concentration were good.  Her memory and overall cognitive skills were adequate.  (Tr. 679).

Claimant's estimated level of intellectual functioning was considered to be average.  Her thought content and organization were logical and goal-directed. Insight and judgment were adequate.

Dr. Durdin's diagnostic impression was adjustment reaction with depressed and anxious mood.  She stated that claimant's ability to understand, remember, and carry out simple instructions and familiar detailed instructions was good.  Her ability maintain attention to perform simple and repetitive tasks for two-hour blocks of time was good.  Her ability to sustain effort and persist at a normal pace over the course of a 40-hour workweek was fair.  She was capable of managing her personal affairs.

**(11) Psychiatric Review Technique ("PRT") dated January 24, 2008**.

Joseph Tramontana, Ph.D., assessed claimant for affective and anxiety-related disorders.  (Tr. 694).  He found that her impairment was not severe.  He

12

determined that she had mild difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace.  (Tr. 704).  She had no restriction of activities of daily living or episodes of decompensation.

**(12) Records from Dr. Harold Ginzburg dated February 22, 2008**.

Claimant's diagnoses were adjustment disorder with mixed anxiety and depressed mood and pain disorder associated with psychological factors.  (Tr. 737).  Dr. Ginzburg opined that she appeared to be engaged in secondary gain activities.  (Tr. 743).

**(13) Records from Dr. Leroy Richard dated November 10, 2006 to December 15, 2006**.  On November 10, 2006, claimant complained of pain to the shoulder region, neck region, back, ribs, left knee, and left ankle.  (Tr. 812).  She had a history of a prior left ankle injury and fibromyalgia diagnosed in 2004.

On examination, claimant had some tenderness of the neck and left knee, but full range of motion.  (Tr. 813).  She also had tenderness in the ribs, abdomen, and lower back, with full range of motion in the back.  Deep tendon reflexes and sensory were symmetrical in all extremities.

Dr. Richard's impression was polymyalgia post MVA.  He prescribed Lortab, Mobic, and physical therapy.  (Tr. 814, 819-25).  He placed claimant on modified duty.

13

On November 7, 2006, claimant reported that she was not taking her medications as prescribed because they "tend to make her feel like a zombie" and she believed she could not function with that.  (Tr. 817).  Dr. Richard told her that she needed to take her medications as prescribed.  He recommended that she continue her activities as tolerated.  (Tr. 818).

On December 15, 2006, claimant continued to complained of pain, which she rated as 8/10.  (Tr. 810).  On examination, she was tender to light touch with paints at all major trigger points.  Dr. Richard's impression was polymyalgia and fibromyalgia.  He referred her to an orthopedist.  (Tr. 811).

**(14) Records from Dr. Stephen Goldware dated June 12, 2008 to July 15, 2008**.  Cervical spine x-rays showed spondylosis C4-5 and C5-6 more severely with some mild disc space narrowing at C5-6.  (Tr. 853).  Claimant had no instability with flexion or extension.

Lumbar spine x-rays and MRI were unremarkable.  (Tr. 854, 857).  There was a small hemangioma seen incidentally within the lower aspect of the T11 vertebral body.  (Tr. 857).

An MRI of the brain showed extensive changes of inflammatory sinus disease.  (Tr. 855).

14

An MRI of the cervical spine showed degenerative disc disease and spondylosis most severe at C4-5 and C5-6.  (Tr. 856).  The right C4-5 and C5-6 neural foramina were equivocally narrowed.

**(15) Records from Dr. John P. Schutte dated November 13, 2008 to January 15, 2009**.  On November 13, 2008, claimant reported that she tripped and fell, injuring her ankle.  (Tr. 890).  X-rays revealed bimalleolar ankle fracture.  Dr. Schutte performed an open reduction internal fixation of the left ankle fracture. (Tr. 887).

Post-surgery, claimant was doing well, and had good range of motion of her ankle.  (Tr. 883).  X-rays showed excellent position of her fracture.  Dr. Schutte instructed her to follow up on an as-needed basis.

**(16) Records from Dr. Daniel Hodges dated January 19, 2009**.  Claimant complained of neck and shoulder pain with numbing of her hands and arms.  (Tr. 894).  Her medications included Celexa, Nexium, Xanax, Talwin, and Flexeril. (Tr. 895).

On examination, claimant's cervical spine range of motion was limited.  (Tr. 896).  She had positive Spurling's maneuver with decreased pin prick over the C5-6 distribution bilaterally.  Grip strength was good.  She had some mid-back rhomboid levator group tension with low-grade spasm.

15

Dr. Hodges' impression was history of motor vehicle accident/pedestrian with multi-level disc herniations at C4-5 and C5-6, currently awaiting surgical stabilization.  He continued her medications.  He opined that she was basically disabled.

**(17) Claimant's Administrative Hearing Testimony**.  At the hearing on January 28, 2009, claimant testified that she had not worked since May of 2007, after she was struck by a vehicle and sustained extensive neck damages.  (Tr. 26). She had settled her worker's comp claim for $110,000, but had netted only about $5,000.  (Tr. 30).

Claimant stated that she slept in the bathtub, and could not get out of bed for two or three days sometimes.  (Tr. 28).  She said that she was raising her 10-year-old daughter.  (Tr. 27).

Claimant reported that her medication was "a temporary fix."  (Tr. 28).  She said that she was taking Celexa for emotional problems which seemed to help. (Tr. 33).  She stated that she did not sleep at night.  (Tr. 28).

Regarding activities, claimant testified that she drove only when absolutely necessary to bring her child to school or the grocery store.  (Tr. 31).  She reported that she had passed out at the wheel twice.

Additionally, claimant said that she occasionally got out of bed and washed some clothes.  (Tr. 34).  She stated that she went out to eat occasionally.

**(18) The ALJ's findings**.  Claimant argues that the ALJ erred: (1) in failing to find that she met the listing of impairments for musculoskeletal disorder and mental disorders;[1] (2) in failing to consider the effects of her medications, and (3) in finding that she had the residual functional capacity to perform the full range of sedentary work.  Because I find that the ALJ erred in assessing the treating physicians' opinions, I recommend that this case be **REMANDED** for further proceedings.

Initially, claimant asserts that her injuries met the criteria for disorders of the spine as set forth in § 1.00 of the Social Security listings.  [rec. doc. 10, p. 4]. While claimant does not specify which part of the listing for musculoskeletal disorders she meets, she refers to the ALJ's finding that she had the impairments of cervical spondylosis and degenerative disc disease.  Thus, it appears that she is arguing that she meets the listing under §1.04, which provides as follows:

> 1.04 *Disorders of the spine*: (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of

---

[1]Although claimant asserts that she has had three repeated episodes of decompensation, there is no evidence of this in the medical records.  [rec. doc. 10, p. 4].  The undersigned agrees with the ALJ's finding that her mental impairments do not meet or equal a listing, which opinion is supported by the PRT and Dr. Durdin's report.  (Tr. 677-79; 694-704).

a nerve root (including the cauda equina) or the spinal cord.

With:
A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

20 C.F.R. Pt. 404, Subpt. P. App. 1 §1.04.

The record reflects that claimant had a history of fibromyalgia.  (Tr. 402). On November 7, 2006, she complained of neck, back, and left leg pain after being struck by an automobile.  (Tr. 402).  An MRI dated January 5, 2007, showed spondylosis at C4-5 and C5-6, diffuse central spondylosis at C4-5 with foraminal narrowing, and foraminal narrowing and flattening of the central canal at C5-6. (Tr. 302).  A DMX report demonstrated hypermobility at C4-5.  (Tr. 309).

Dr. Cobb's impression was post-traumatic cervical pain syndrome, myofascial pain syndrome of the cervical spine, temporomandibular joint syndrome, C1-2 and C2-3 facet pain, and *symptomatic* cervical spondylosis at C4-5 and C5-6, with narrowing at both levels, *irritating* the nerves, and instability at C4-5.  (Tr. 303).  (emphasis added).  Dr. Vizzi also determined that her MRI scans

18

showed nerve impingement.  (Tr. 608).[2]

On February 13, 2008, Dr. Cobb's assessment was *degeneration* of the C4-5 and C5-6 levels, and carpal tunnel syndrome on the right, clinically also on the left.  (emphasis added).  (Tr. 770).  He recommended a carpal tunnel release on the right, and an anterior cervical discectomy and fusion with plate.  He wrote that she was unable to work at that time.

On January 19, 2009, Dr. Hodges found that claimant's cervical spine range of motion was limited, and she had positive Spurling's maneuver with *decreased pin prick over the C5-6 distribution bilaterally*.  (emphasis added).  (Tr. 896).  His impression was multi-level disc herniations at C4-5 and C5-6, currently awaiting surgical stabilization.  He opined that she was basically disabled.

In considering claimant's impairments, the ALJ found that they were severe, but not totally disabling.  (Tr. 21).  He stated that MRI scanning of the cervical spine "noted no stenosis."  However, Dr. Vizzi noted that the cervical MRI showed "bilateral foraminal stenosis at both levels."  (Tr. 607).  Further, Dr. Vizzi found that her MRI scans showed disk issues "with nerve impingement," and that her symptoms "are consistent with this."  (Tr. 608).

---

[2]However, Dr. Anseman noted that an MRI showed disc bulges at C4-5 and C5–6, but no disc herniations or impingements.  (Tr. 340).

19

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Leggett v. Chater*, 67 F.3d 558, 566 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given *controlling* weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence."  (emphasis added).  Newton, 209 F.3d at 455 (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Leggett*, 67 F.3d at 566; Greenspan, 38 F.3d at 237.

In this case, the ALJ found that claimant had severe impairments of cervical spondylosis and degenerative disc of the cervical spine.  (Tr. 17).  However, he did not cite any evidence for discounting Dr. Cobb's or Dr. Hodges' opinions that claimant was unable to work.  The expert opinion of a treating physician as to the

existence of a disability is binding on the fact-finder "unless contradicted by substantial evidence to the contrary."  (emphasis added).  *Loza v. Apfel*, 219 F.3d 378, 393 (5ᵗʰ Cir. 2000) (*quoting Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir.1978)); *see also* 20 C.F.R. § 404.1527(d)(2).  Here, the ALJ has cited no evidence to contradict her treating physicians' findings.  In fact, there exists in the record substantial evidence which *supports* these findings.

The Fifth Circuit has held that "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)."  (emphasis in original).  *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

In *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001), the court held that an ALJ must consider the following factors before declining to give any weight to the opinions of a treating doctor: length of treatment, frequency of examination, nature and extent of relationship, support provided by other evidence, consistency of opinion with record, and specialization.  *Id.* at 621 (*citing Newton*, 209 F.3d at 456).   The ALJ did not consider those factors in this case, which constitutes error.

Additionally, the ALJ did not comment on the possible side effects from claimant's medications on her ability to work.  The records indicate that claimant was still taking Celexa, Nexium, Xanax, Talwin, and Flexeril at the time of Dr. Hodges' last  report on January 19, 2009.  (Tr. 895).  Talwin is a narcotic used for the treatment of moderate to severe pain.  Flexeril is a muscle relaxer.  Common side effects from these medications include dizziness and drowsiness.  The record reflects that claimant complained to her  physicians that the medications made her feel  "goofy" and like a "zombie."  (Tr. 367, 817).  Thus, there exists in the record objective evidence to support claimant's complaints.

Under the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms."  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. § 404.1529(c)(3)(iv)).  The ALJ's failure to consider the effects of claimant's medication on her ability to work was error.

The ALJ found that claimant had the RFC to perform a full range of sedentary work.  (Tr. 22).  However, the records from Drs. Cobb and Hodges indicate that claimant was "disabled."  There has been no updated RFC assessment since the rendering of these opinions.  The ALJ did not address this opinion of the claimant's treating physicians which, again, has objective support in the record.

22

Accordingly, the undersigned recommends that the undersigned recommends that this case be **REMANDED** to the Commissioner for further administrative action pursuant to the fourth sentence of 42 U.S.C. § 405(g).  This includes, but does not limit, sending the case to the hearing level with instructions to the Administrative Law Judge to order an updated consultative examination of claimant or an evaluation by claimant's treating physicians, specifically as to her residual functional capacity to perform any work.

Inasmuch as the remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).  *See, Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992) and Shalala v. Schaefer, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed August 18, 2011, at Lafayette, Louisiana.

C. Michael Hill

C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE

25